# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

**ANN YARNELL,**

>**Plaintiff,**

**v.**                                            **No. Civ. 21-00520 JCH-LF**

**BANK OF AMERICA, N.A.,**

>**Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 21, 2021, Defendant Bank of America, N.A., ("Defendant" of "BANA") filed a *Motion to Dismiss* (ECF No. 6), seeking to dismiss all claims in the case. The Court, having considered the motion to dismiss, briefs, pleadings, relevant law and otherwise being fully advised, concludes that the motion to dismiss should be granted.

## I.   <u>LEGAL STANDARD ON A MOTION TO DISMISS</u>

On a motion to dismiss, the court generally assesses the legal sufficiency of the allegations contained within the four corners of the complaint. *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008). Rule 8 requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court accepts as true all well-pleaded facts, viewing them in the light most favorable to the nonmoving party and allowing all reasonable inferences in favor of the nonmoving party. *Archuleta*, 523 F.3d at 1283. The court "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The complaint "does not need

detailed factual allegations," but "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

If on a motion to dismiss matters outside the pleadings are presented to and considered by the court, the motion generally must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). Under Rule 12(d), a court has broad discretion to refuse to accept the extra-pleading materials and resolve the motion solely on the pleading itself. *See Lowe v. Town of Fairland,* 143 F.3d 1378, 1381 (10th Cir. 1998). No conversion is required, however, when the court considers documents incorporated into the complaint by reference and central to the plaintiff's claim, unless their authenticity is questioned. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008). Accordingly, the Court has considered the factual allegations of the complaint in the light most favorable to Plaintiff as well as the contract attached to Defendant's motion to dismiss, because the latter was referred to in Plaintiff's complaint and is central to her claim.

## II.   FACTUAL BACKGROUND

BANA is a wholly owned subsidiary of Bank of America Corporation ("BAC"), which acquired U.S. Trust Corporation and renamed it U.S. Trust, Bank of America Private Wealth Management ("U.S. Trust"). (Compl. ¶¶ 4, 13, ECF No. 1-1.) BANA appointed U.S. Trust as its agent for the purpose of its conduct as alleged in this case, and U.S. Trust acted within the scope of this agency as to its acts described herein. (*Id.* ¶ 9.) John Raymond Yarnell made a will, dated April 19, 1960, which provided for the establishment of the Ruth J. Yarnell Trust, named after his wife. (*See id.* ¶¶ 10-12.) The original trustee bank merged into BANA in 1999, and then BANA

served as trustee for approximately 20 years. (*See id.* ¶¶ 12.) From 2007 to 2019, BANA managed the assets of the Ruth J. Yarnell Trust through U.S. Trust. (*Id.* ¶ 13.)

On March 10, 2017, the principal and accumulated income of the Ruth J. Yarnell Trust became distributable in equal shares to Barbara, Ann, Thomas, and Martha Yarnell, John and Ruth Yarnell's grandchildren. (*See id.* ¶¶ 10, 19.) Hoping to keep them as customers, BANA and U.S. Trust representatives explained to the siblings how U.S. Trust would provide them individually with comprehensive and collaborative wealth management services and promised them that U.S. Trust would manage their assets as a fiduciary, "both in terms of making initial investment and administrative decisions, as well as in a continuous review and monitoring of our fiduciary relationships." (*Id.* ¶ 20.) U.S. Trust representatives gave the siblings marketing materials stating that U.S. Trust would serve as a fiduciary in their best interests, learning about their lives, working to understand their priorities, and holding itself to a "standard of care" that is "the highest of all." (*Id.* ¶ 21.) Barbara Yarnell ("Barbara") explained her understanding of U.S. Trust's assurances to Plaintiff Ann Yarnell ("Plaintiff" or "Ann"). (*Id.*)

At all relevant times, Plaintiff was physically incapacitated by morbid obesity, was unable to work, suffered from social isolation, and was vulnerable to exploitation. (*Id.* ¶ 24.) Barbara dealt with BANA and U.S. Trust on behalf of her father prior to his passing, and she dealt with U.S. Trust to assist Plaintiff. (*See id.* ¶¶ 25-26.) Over the course of these dealings, Barbara notified U.S. Trust of Plaintiff's disability and dependence on others for care and protection. (*Id.* ¶ 26.) On August 7, 2017, Plaintiff instructed BANA to direct her share of the principal and accumulated income from the Ruth J. Yarnell Trust into a U.S. Trust account. (*Id.* ¶ 30.) After evaluating the choice of accounts offered by BANA and U.S. Trust with her sisters' assistance, on September 9, 2017, Plaintiff signed BANA's Investment Services Agreement ("the Agreement") for its

management of her U.S. Trust account as an Investment Management Account ("Plaintiff's Account"). (*Id.* ¶¶ 32-33.) The Agreement incorporated the Investment Services Agreement Terms and Conditions booklet ("the Booklet"). (*See* Agreement, ECF No. 7-1 at 1 of 34.)[1]

U.S. Trust discussed investment objectives for Plaintiff with Barbara, and U.S. Trust was reminded about Ann's age, disability, and vulnerability to social isolation and exploitation. (Compl. ¶ 38, ECF No. 1-1.) U.S. Trust knew Ann's financial needs were met by her Medicare and Social Security disability payments. (*Id.*) BANA and U.S. Trust recommended to Ann that she choose a "Balanced Appreciation" investment objective, which she accepted, that it described as a focus on capital appreciation with a potential for current income through a higher allocation to equities than fixed income and, where appropriate, other asset classes. (*Id.* ¶ 39.) According to the Investment Policy Statement that U.S. Trust prepared for Plaintiff, U.S. Trust would have complete investment authority over Plaintiff's Account except to prohibit investment in real estate and private equity. (*Id.* ¶ 40.) The Investment Policy Statement further provided that U.S. Trust would manage the assets in a balanced manner with an emphasis on long-term growth and current income, contemplating a long-term investment time horizon of more than ten years with "no specific requirements to maintain liquidity for short-term cash flow needs." (*Id.* ¶ 41.) To maintain a conservative distribution schedule, U.S. Trust arranged a monthly transfer of $2,500 for a total of $30,000 per year. (*Id.*)

In early 2018, Plaintiff began an online friendship with someone who turned out to be a fraudster. (*Id.* ¶¶ 43-44.) The fraudster told her he was overseas completing a business project, but

---

[1] Defendant attached the Agreement to its motion to dismiss. The first paragraph of the Agreement states: "The Investment Services Agreement Terms and Conditions booklet (the 'Booklet'), any exhibits provided to the Owner, and any applicable amendments, addenda, or revisions, are part of this Investment Services Agreement. These documents are collectively referred to as the 'Agreement'." (Agreement, ECF No. 7-1 at 1 of 34.) Because the Agreement was incorporated into the complaint by reference, is central to Plaintiff's breach of contract claim, and Plaintiff does not question its authenticity, the Court will consider its contents, including the Booklet, without converting the motion into one for summary judgment.

he suffered a business setback, so if she would lend him money, he could resolve it, he would return to the United States sooner, and they could get married. (*Id.* ¶ 44.) From April 2018 to September 2018, Plaintiff asked U.S. Trust to transfer $582,500 to her, which she then paid to the scammer who disappeared. (*Id.* ¶ 45.) The pattern of transfers that U.S. Trust transferred to Plaintiff at her request were $50,000 in April; $77,000 in May, $75,500 in June; $130,000 in July; $160,000 in August; and $90,000 in September. (*Id.* ¶ 46.) U.S. Trust recorded the following as reasons for Plaintiff's requests: taxes, hospital bills, medical bills, medical expenses that insurance did not cover, and unexpected things that came up. (*Id.* ¶ 47.) U.S. Trust made no reasonable inquiries as to why Plaintiff needed these amounts in such a short period of time, requests that were inconsistent with her long-term investment time horizon, known financial needs, and the need for the assets to provide for her life-time financial well-being. (*See id.* ¶¶ 47-48.)

On March 29, 2021, Plaintiff filed suit against BANA in state court in New Mexico for breach of contract, breach of fiduciary duty, and negligence. Defendant removed the case to the United States District Court for the District of New Mexico on June 7, 2021. Defendant filed a Motion to Dismiss all three claims for failure to state a claim and for failure to file suit in the proper court.

## III.   ANALYSIS

### A.   The United States District Court for the District of New Mexico is a proper forum for this lawsuit and the Court will apply New Mexico law when ruling on this motion to dismiss

Defendant argues that, pursuant to the mandatory forum selection clause in the Agreement, the courts of New Mexico are not a proper forum and the case should have been brought in a Texas court. Defendant therefore asserts that the case should be dismissed. Plaintiff responds that this case is properly heard in this forum.

The Supreme Court held that motions to dismiss are improper procedural mechanisms for the enforcement of forum selection clauses. *See Atl. Marine Constr. Co., Inc. v. U. S. Dist. Court*, 571 U.S. 49, 52 (2013). Rule 12(b)(3) allows dismissal only when venue is "wrong" or "improper" in the forum in which the suit was brought. *Id.* at 55. Since the federal venue provisions alone define whether venue is proper in a particular forum, resolution of a 12(b)(3) motion "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Id.*

The federal statute controlling venue in removed actions is 28 U.S.C. § 1441(a). *See Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665-666 (1953); *Lundahl v. Pub. Storage Mgt., Inc.*, 62 F. App'x 217, 218 (10th Cir. 2003) (unpublished). "Section 1441(a) expressly provides that the proper venue of a removed action is 'the district court of the United States for the district and division embracing the place where such action is pending.'" *Polizzi*, 345 U.S. at 666 (quoting § 1441(a)). Because Defendant removed this case from the First Judicial District Court in Santa Fe County, New Mexico, this district embraces the place where the present action was pending, and venue is proper in this Court. *See* 28 U.S.C. § 111 (2012) ("New Mexico constitutes one judicial district."); *cf. Polizzi*, 345 U.S. at 666 (determining that venue was proper in the Southern District of Florida, the "district embracing Dade County," where the removed case had been pending).

The appropriate mechanism for enforcement of a forum selection clause is either a motion for transfer under § 1404(a) (when the provision points to another federal court) or a motion to dismiss on *forum non conveniens* grounds (when the provision points to another state or foreign court). *See Atl. Marine*, 571 U.S. at 59-61; *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 668 (10th Cir. 2020). *See also Bacon v. Liberty Mut. Ins. Co.*, 575 F.3d 781, 783 (8th Cir. 2009) (explaining that, where there is an alternative federal forum, district court lacked power

of dismissal because § 1404(a) superseded common law doctrine of *forum non conveniens* insofar as transfer to another federal district court is possible). Section 1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Defendant here only seeks dismissal, not transfer. Because Defendant has not set forth the grounds under Section 1404(a) for transfer, the Court will not consider transfer at this time. *See Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991) (party moving for transfer bears burden of demonstrating that present forum is inconvenient).

As for dismissal, Defendant has not set forth the basis necessary to compel dismissal of this case on *forum non conveniens* grounds. Moreover, even assuming that Rule 12(b)(6) may be an appropriate method for enforcing a forum-selection clause in a breach of contract case, this Court is not convinced Defendant has shown that Texas is the appropriate forum as a matter of law.

Courts evaluate forum selection clauses according to ordinary principles of contract interpretation. *Kelvion, Inc v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1092 (10th Cir. 2019). Under the Agreement, a case "must be brought in the state whose law governs or controls this Account…." (Agreement § XI, ECF No. 7-1 at 25 of 34.) According to Section XI, this "Agreement will be governed by the applicable laws of the state where the Account is principally administered, as designated by the Bank." (Agreement § XI, ECF No. 7-1 at 25 of 34.) BANA submitted the Affidavit of Jenae Guillory, a Senior Vice President, Market Trust Director with BANA, who averred that Plaintiff's account was administered by BANA in the state of Texas. (Guillory Aff. ¶¶ 3, 8, ECF No. 7-2.) Defendant thus argues that Texas law governs this case based

on the language of the Agreement. On the other hand, Plaintiff contends that, because she executed the Agreement in New Mexico, New Mexico law controls.

A federal court with jurisdiction based on diversity generally applies the substantive law, including choice of law rules, of the State in which it sits. *Gerson v. Logan River Academy*, 20 F.4th 1263, 1270 (10th Cir. 2021). Under New Mexico law, "the law to be applied to a particular dispute may be chosen by the parties through the contractual choice-of-law provision," so long as application of the law does not offend New Mexico policy. *Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 7, 144 N.M. 464. An ambiguous clause will be construed against the drafter. *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1346 (10th Cir. 1992).

The Court finds the choice-of-law provision in the Agreement ambiguous as to which state's law will apply. The provision does not designate a specific state whose law governs or controls. Instead, it provides that the Agreement is "governed by the applicable laws of the state where the Account is principally administered, as designated by the Bank." (Agreement § XI, ECF No. 7-1- at 25 of 34.) Defendant has not asserted what the meaning of "principally administered" is or how or when the Bank designates where an account is principally administered. Nor has Defendant pointed to other language in the Agreement that would indicate whether the parties had a meeting of the minds as to which forum's law would apply to disputes arising from the contract when they signed the Agreement. "Absent special circumstances, courts usually honor the parties' choice of law because two 'prime objectives' of contract law are 'to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract.'" *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418 (10th Cir. 2006) (quoting Restatement (Second) of Conflict of Laws § 187 cmt. e.). Here, it is not clear what the

justified expectations of the parties were or whether they could foretell with accuracy which state's law would apply to the contract.

Furthermore, even if the Court determined the clause to be unambiguous, the factual record is not clear that the account was "principally administered" in Texas. The only evidence on this point is a statement from Ms. Guillory that Plaintiff's account was "administered" in Texas – not principally administered in Texas. In addition, the record is lacking as to when the Account was so administered, by what representatives, how Defendant so designated where an account was administered, what acts were taken by the BANA in Texas, etc. The record fails to establish that the parties had a meeting of the minds that a Texas court was the exclusive court in which to bring suit for an action regarding Plaintiff's Account and that Texas law controls.

Under New Mexico law, when there is not a governing, unambiguous choice-of-law provision, the initial step in conflicts analysis is characterization: deciding the area of substantive law to which the law of the forum assigns a particular claim or issue. *Ratzlaff v. Seven Bar Flying Serv., Inc.*, 1982-NMCA-071, ¶ 15, 98 N.M. 159. Here, Plaintiff brings breach of contract, breach of fiduciary duty, and negligence claims.

As for the contractual claims, New Mexico interprets contracts according to the law of the place where the contract was executed. See *Shope v. State Farm Ins. Co.*, 1996-NMSC-052, ¶ 9, 122 N.M. 398. "When interpreting a contract under the lex loci contractus rule, courts look to the law of the place where the contract was consummated," which is "where the last act necessary for its formation was performed." *State Farm Mut. Ins. Co. v. Conyers*, 1989-NMSC-071, ¶ 15, 109 N.M. 243. "A contract is made at the place where the last signature is affixed." *Id.*

Construing the facts of the complaint and inferences in favor of Plaintiff, Plaintiff appears to have signed the contract in New Mexico on September 9, 2017. (*See* Compl. ¶¶ 1, 25, 31-33,

ECF No. 1-1.) Melanie Kelly from U.S. Trust signed the Agreement on September 29, 2017, but the record does not show where she was located at the time. (*See* Agreement, ECF No. 7-1 at 3 of 34.) Ms. Guillory's Affidavit states that the final step in opening Plaintiff's account occurred when "an authorized representative of the Bank who reported directly to me signed and inserted the date of September 29, 2017." (Guillory Aff. ¶ 6, ECF No. 7-2.) While Ms. Guillory is a resident of Texas, (*see id.* ¶ 1), there is no information as to where Ms. Kelly was at the time that she signed the Agreement. While Ms. Kelly may have also worked in Texas under the direct supervision of Ms. Guillory, the Court will not presume that fact, given that a supervisor may directly oversee employees in remote locations. The Court will also not assume Ms. Kelly's location was in Texas given the ease in which the Affidavit could have stated Ms. Kelly's location at the time, but it did not. Furthermore, it is not clear whether Ms. Kelly's signature was the last act for contract formation or if Plaintiff's signature on the paperwork completed the agreement, as Plaintiff urges. For all the foregoing reasons, the record is insufficient for this Court to conclude that Texas was the place of consummation of the contract, rather than New Mexico.

In determining which jurisdiction's law should apply to a tort action, New Mexico courts have a "strong presumption" that the doctrine of lex loci applies in tort cases, in which courts apply the law of the state where the wrong occurred. *Tuato v. Brown*, 85 F. App'x 674, 676 (10th Cir. Dec. 30, 2003) (unpublished) (citing, among other cases, *Torres v. State*, 119 N.M. 609, 894 P.2d 386, 390 (N.M. 1995)).[2] In *Torres*, the New Mexico Supreme Court observed that the place of the wrong is "the location of the last act necessary to complete the injury." *Torres*, 1995-NMSC-025, ¶ 13 (internal quotations omitted). Plaintiff argues that the harm to her occurred in New Mexico,

---

[2] The Agreement says that the "Agreement will be governed by the applicable laws of the state where the Account is principally administered." It is not clear from that provision that the parties intended the choice-of-law provision to apply to tort actions.

and Defendant did not rebut this argument in its reply. The Court will therefore apply New Mexico law to the tort claims.

Ultimately, the Court is not convinced that applying New Mexico law, rather than Texas law, will affect the outcome. As to the laws applicable for resolution of this case, New Mexico and Texas law are substantively similar.

### B.  Plaintiff's breach of contract claim should be dismissed

According to the Complaint, Defendant agreed to manage Plaintiff's investments as a fiduciary in accordance with her Investment Policy Statement, and it had authority to refuse to make changes to Plaintiff's Account for a reasonable time to inquire about suspicious circumstances indicating illegal conduct or harmful conduct to protect her investment objectives. (*See* Compl. ¶¶ 52-53, 62, ECF No. 1-1.) Plaintiff asserts that BANA breached the Agreement and the implied covenant of good faith and fair dealing by failing to exercise means readily available to it for exposing Plaintiff's exploitation and protecting her from fraud. (*Id.* ¶ 65.) Defendant, however, argues that it cannot be held liable as a matter of law for actions taken pursuant to Plaintiff's instructions.

If a contract is unambiguous, the court is bound to enforce its terms. *Sanchez v. Herrera*, 1989-NMSC-073, ¶ 20, 109 N.M. 155. A court may determine the meaning of a contract as a matter of law when "the evidence presented is so plain that no reasonable person could hold any way but one." *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778. An ambiguity exists for determination by a jury where the court finds that the contract is reasonably and fairly susceptible of different interpretations and the proffered evidence regarding surrounding facts and circumstances presents a question of fact. *See id.* "In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of

the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." *Id.* ¶ 13. Courts should interpret contract terms according to their usual and ordinary meaning. *Western Commerce Bank v. Reliance Ins. Co.*, 1987-NMSC-009, ¶ 8, 105 N.M. 346. *See also URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018). Moreover, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement, requiring that neither party do anything to deprive the other of the benefits of the agreement. *Watson Truck & Supply Co., Inc. v. Males*, 1990-NMSC-105, ¶ 12, 111 N.M. 57.

Section VII.A of the Agreement states: "The Bank is not liable … for actions taken or omitted … pursuant to instructions from Owner…." (Agreement § VII.A, ECF No. 7-1 at 23 of 34.) The Agreement further says in Section II.A that Defendant "will distribute the Account Assets as Owner directs in accordance with this Agreement." (*Id.* § II.A, ECF No. 7-1 at 17 of 34.) Defendant argues that, because Plaintiff alleges in her Complaint that she told Defendant to transfer $582,500 in total funds to her, it cannot be liable under the plain terms of the contract. The Court agrees that a plain reading of the Agreement is that it precludes a claim for breach of contract that arises from Defendant having followed Plaintiff's instructions to distribute her own Account Assets to her. The Complaint clearly states that Plaintiff directed BANA to distribute her account assets to her in the requested amounts, and it did so. The Agreement imposed a duty on BANA to follow Plaintiff's directions regarding the distribution of her own assets.

Plaintiff nonetheless contends that BANA, under the contract, was to distribute the Account Assets as Plaintiff directed "in accordance with this Agreement." (Agreement § II.A, ECF No. 7-1 at 17 of 34.) Attempting to inject ambiguity into the contract's meaning, Plaintiff argues that other provisions in the Agreement gave BANA a duty to advise Plaintiff against such drastic withdrawals that would not protect her assets, as set forth in Plaintiff's investment objectives.

12

Plaintiff relies on the provisions of the Agreement that state that her "Investment Objective remains in effect until Owner expressly notifies the Bank otherwise", and that, "[i]n its discretion, and without being obligated to give prior notice, the Bank is authorized to make such investment changes as it deems appropriate, in accordance with Owner's stated Investment Objective." (Agreement § I.A.1 & § I.B, ECF No. 7-1 at 14-15 of 34.) Plaintiff, however, does not allege liability for *investment* changes, for which the contract contemplates BANA having discretion; rather, Plaintiff contends that BANA should not have allowed her to divest her own funds. The provision regarding distribution of funds is clear – BANA had to distribute the account's funds as Plaintiff "directs in accordance with this Agreement."

Plaintiff asserts that the Agreement required BANA to refuse to make changes to the account before inquiring about suspicious circumstances that might be indicative of illegal conduct or conduct harmful to Plaintiff. Plaintiff, however, points to no language in the Agreement itself that expressly imposed on BANA a duty to withhold distributions for a reasonable amount of time to investigate the true reasons for Plaintiff's stated withdrawals. Regarding distributions, the Agreement described processes by which distributions must be made, how an Owner should give an instruction, when the instruction is effective, and how much time BANA had to comply with the instruction. (*See* Agreement § II.D, ECF No. 7-1 at 18-19 of 34.) For example, BANA agreed to distribute income first, and then principal if income was insufficient. (*Id.* at 19 of 34.) The Agreement also contemplated some discretion by BANA after receiving a directive from Plaintiff. For example, BANA "is not required to comply with any instruction that the Bank believes might subject the Bank or any Bank Affiliate to liability or expense or any instructions to commence or defend any action." (Agreement § II.D.2, ECF No. 7-1 at 18 of 34.) The Complaint, however, does not allege that BANA believed following Plaintiff's instructions would cause it liability or

expense. To the contrary, Plaintiff asserts that she gave BANA reasons for her withdrawals such as taxes and medical expenses. The Complaint thus does not suggest that BANA believed following her directive to turn over her own assets to her would create liability or expense to BANA. According to the contract, BANA also was not required to act at the Owner's direction when it "in good faith doubts the validity or meaning of such instructions" or when it receives "conflicting instructions." (*Id.*) This provision, however, also does not give rise to a plausible claim for breach of contract because the Complaint does not allege that BANA doubted that Plaintiff was giving the instruction or did not understand the meaning of Plaintiff's instructions.

That the Agreement does not create liability for BANA's following Plaintiff's stated directives is confirmed by repeated provisions that disclaim liability arising from such circumstances. Section II.D.2 of the Agreement stated that "Owner will be liable for any losses resulting from the Bank's compliance with Owner's instructions." (Agreement § II.D.2, ECF No. 7-1 at 18 of 34.) The Agreement confirmed later, "The Bank shall be protected in relying on instructions from Owner or a representative of Owner until it receives notice of the inability of that person or entity to act under this Agreement (e.g., notice of the Owner's … incapacity …) and has had a reasonable time to act on such notice…." (*Id.* § II.D.5, ECF No. 7-1 at 19 of 34.) Nowhere in Plaintiff's Complaint does she allege that she was legally incompetent, mentally unable to make her own decisions, or had notified BANA of her inability to act under the Agreement. Although Plaintiff alleges that she was physically disabled and vulnerable to exploitation, she asserts that she signed the Agreement for herself. The Agreement is unambiguous that there is no breach of the contract when BANA follows the instructions of the owner of the account.  (*See* Agreement § VII.A, ECF No. 7-1 at 23 of 34 ("The Bank is not liable … for actions taken or omitted … pursuant to instructions from Owner….").

### C.  The exculpatory clauses in the Agreement are enforceable

Defendant argues that Section VII.A also precludes liability against BANA for breach of fiduciary duty or common law negligence when Defendant is following Plaintiff's directives. Plaintiff's claims for breach of fiduciary duty and negligence arise out of the same act – Defendant following Plaintiff's instruction to deliver certain funds from her account to her. The parties agreed that BANA would not be liable in contract or tort under such circumstances.

Moreover, Defendant contends that Plaintiff's claims for breach of fiduciary duty and negligence must be dismissed because the Agreement unambiguously precludes claims based on common law or implied duties. In support of its position, Defendant relies on Section VII.A of the Agreement where it states:

> The Bank is responsible for the performance of only such duties as are specifically set forth in this Agreement with no implied duties or responsibilities. This means, without limitation, that the relationship between the Bank and Owner with respect to the Account is contractual only and governed solely by the terms of this Agreement to the exclusion of any concepts of tort or common law…. The Bank is only liable for any loss, reduction in value or income directly caused by its gross negligence or willful misconduct.

(Agreement § VII.A, ECF No. 7-1 at 23 of 34.) Defendant argues that, according to Texas law, this exculpatory clause must be enforced. Plaintiff, however, asserts that New Mexico law governs, and the Agreement's exculpatory clause is void as a matter of public policy.

Even applying New Mexico law, as Plaintiff urges, the exculpatory clause is not void as a matter of public policy. New Mexico generally enforces exculpatory clauses that release liability. *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶ 27, 134 N.M. 341; *Lynch v. Santa Fe Nat. Bank*, 1981-NMCA-055, ¶ 6, 97 N.M. 554. Exculpatory clauses, however, will be strictly construed against the drafter, and releases may be unenforceable as against public policy based on

statutory or common law. *Berlangieri*, 2003-NMSC-024, ¶¶ 28-29, 38.[3] A party also cannot exempt itself from liability for intentionally or recklessly causing tortious harm. *See id.* ¶ 26.

The New Mexico Supreme Court identified the following six factors as indicators helpful in determining the larger question of whether enforcement of a release would be unjust:

> [T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself [or herself] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his [or her] services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his [or her] agents.

*Id.* ¶ 39 (quoting *Tunkl v. Regents of Univ. of California*, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963)). The *Berlangieri* court, however, cautioned that a balancing test of these six factors is not appropriate, because it is "possible that only one of these factors would be applicable, but that factor would be significant enough to make the release unenforceable." *Id.*

As to the first factor, Plaintiff asserts that investment accounts are subject to state and federal regulation in the form of securities acts and banking regulations. The relevant inquiry for a court, however, is not whether the statute imposes duties, "but whether it generally expresses a policy that the duty of ordinary care may not be disclaimed in this context." *Berlangieri*, 2003-NMSC-024, ¶ 41. Plaintiff does not point to a specific statute or regulation that meets this standard.

---

[3] Texas law likewise enforces exculpatory clauses "unless one party is at a disadvantage in bargaining power and the contract is void as against public policy." *Derr Const. Co. v. City of Houston*, 846 S.W.2d 854, 859 (Tex. Ct. App. 1992).

Moreover, as Defendant points out, in this case the transaction at issue is releasing Plaintiff's own funds to her at her request, and Plaintiff has not shown public regulation regarding such a transfer. This factor thus does not offer much guidance to the Court in this case.

Turning to the next factors, Plaintiff argues that handling of investment accounts is a matter of practical necessity for customers who are members of the public and have no direct access to the securities markets. Defendant contends that this factor has limited utility because it is not BANA's investment or market-related services that are at issue in this case. The New Mexico Supreme Court has given the following as examples of services of "practical necessity" to the public: utility services, common carriers, hospitals, or employers. *See id.* ¶ 51. The Court has no allegations in the complaint or evidence before it concerning whether a customer must use the services of businesses like BANA when engaging in such investments. The Court is thus not convinced that the second factor weighs against enforcing the release. *Cf. Lynch*, 1981-NMCA-055, ¶ 22 ("Although defendant is a bank, that fact alone does not make defendant's escrow service either a banking function or a public service."). But, with respect to the third factor, Defendant does not seem to dispute that it makes its investment services generally available to all members of the public.

Regarding the fourth and fifth factors, Plaintiff contends that BANA has a decisive bargaining advantage against members of the public who are unsophisticated investors, and it used a standardized form contract. Defendant does not dispute that the form it uses is a standardized contract or that it does not contain a provision to pay additional fees for added protection against negligence. While BANA may have a bargaining advantage regarding investment services, the fourth factor is "in the economic setting of the transaction." The nature of the transaction at issue in the case therefore informs the analysis. Here, Plaintiff's claim does not arise from the manner

in which BANA invested her funds; rather, the transaction at the heart of the dispute is how it distributed her funds to her at her direction. In this regard, the bargaining strength of BANA over Plaintiff is not decisive, as the Agreement required Defendant to "distribute the Account Assets *as Owner directs* in accordance with this Agreement." (Agreement § II.A, ECF No. 7-1 at 17 of 34 (italics added).) Moreover, when considering the superior bargaining power of the promisor, the inquiry focuses on whether Plaintiff was required to deal with Defendant because of an absence of alternatives. *See Lynch*, 1981-NMCA-055, ¶ 11. Neither the complaint's allegations nor anything before the Court suggests an absence of alternatives such that Plaintiff had no choice but to accept an exculpatory clause because all investment companies that she encountered in the marketplace required such a release. *Cf. id.* ¶ 15 ("There being no showing of an absence of alternatives, there is no basis for applying the superior bargaining power concept….").

Lastly, as for the sixth factor, Plaintiff asserts that she, as a consumer, placed her assets in the control of BANA subject entirely to its risk of carelessness. But again, the sixth factor focuses on the transaction – whether as a result of the transaction, Plaintiff's property is placed under the control of Defendant. *See Berlangieri*, 2003-NMSC-024, ¶ 39. The transaction at issue was Defendant returning Plaintiff's funds to her at her request. Again, the contract required Defendant to distribute her funds as she directed.

Considering all six factors, Plaintiff has not plausibly shown that the exculpatory clause in the Agreement is unenforceable given the nature of the transaction as alleged here. The Court therefore concludes that the exculpatory clause is enforceable and that the parties agreed that BANA would not be held liable in contract or tort for breach of fiduciary duty or negligence for following Plaintiff's instructions.

### D. Plaintiff did not state a claim arising from willful misconduct or for gross negligence

As Defendant acknowledges, the Agreement provides that BANA "is only liable" for losses "directly caused by its gross negligence or willful misconduct," (Agreement § VII.A, ECF No. 7-1 at 23 of 34). Defendant, however, asserts that Plaintiff failed to allege willful misconduct and that the allegations do not amount to gross negligence as a matter of law.

A party cannot exempt itself from liability in tort for harm that it causes intentionally or recklessly. *Berlangieri*, 2003-NMSC-024, ¶ 26. New Mexico law defines "willful conduct" as "the intentional doing of an act with knowledge that harm may result." N.M.U.J.I 13-1827. The allegations of the complaint do not suggest that Defendant distributed Plaintiff's funds to her with knowledge that harm may result. The Complaint thus does not state a claim based on willful misconduct.

As for whether Plaintiff stated a claim for gross negligence, the parties appear to agree that both Texas and New Mexico law are the same as to the standard this Court should apply. (*Compare* Def.'s Mot. 9, ECF No. 7, *with* Pl.'s Resp. 12, ECF No. 13.) Gross negligence is defined as "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." (Pl.'s Resp. 12, ECF No. 13 (quoting *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006)).

Despite failing to allege expressly that Defendant acted with gross negligence or with conscious indifference to her welfare, Plaintiff argues that whether BANA's conduct rises to the level of gross negligence is a question of fact and that the allegations are sufficient to show reckless conduct. According to Plaintiff, it is enough that she alleged that Defendant knew of Plaintiff's disability and vulnerability to exploitation, knew she received Medicare and Social Security disability benefits, knew that Plaintiff was withdrawing considerable sums of money in a short amount of time, and knew that the withdrawals were inconsistent with her needs and long-term

objectives. Plaintiff argues that these allegations plausibly show an intentional act by BANA of distributing her funds to her with utter indifference to the consequences.

Plaintiff pled only a claim for negligence, not gross negligence. The allegations of the complaint do not show that BANA was subjectively aware of an extreme degree of risk and that it acted with conscious indifference to Plaintiff's welfare when it distributed her own account assets to her. The factual allegations are that Defendant distributed Plaintiff's own funds to her based on her directive to do so, and as the contract required it to do. Plaintiff also alleges that she gave Defendant reasons for the withdrawals – reasons that she knew were false but that sounded like legitimate needs. The allegations are not sufficient to show that BANA distributed the funds with a conscious indifference to harmful consequences to Plaintiff or that it was aware of an extreme degree of risk.

## IV.    CONCLUSION

Where a complaint and contract admit all elements of a defense, and there is no disputed issue of fact raised by defense, or the facts are completely disclosed on the face of the pleadings, resolution of the defense is appropriate on a motion to dismiss. *Frost v. ADT, LLC*, 947 F.3d 1261, 1267 (10th Cir. 2020). The Agreement is plain that Defendant does not breach the contract and cannot be held liable in contract or tort when it acts according to Plaintiff's directions. The facts disclosed in the Complaint establish that Plaintiff cannot succeed on her claims as a matter law based on a plain reading of the contract. Moreover, the allegations do not plausibly state a claim for gross negligence. Given that the Court has determined that Plaintiff's claims cannot succeed on these grounds, the Court has no need to consider the additional arguments raised by Defendant that it contends supports dismissal (*e.g.*, that equitable estoppel, the economic loss doctrine, or a contractual limitations time-period bar her claims).

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Dismiss* (**ECF No. 6**) is **GRANTED** and all claims in this case are **DISMISSED WITH PREJUDICE**.

_____
SENIOR UNITED STATES DISTRICT JUDGE